TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






ON MOTION FOR REHEARING









NO. 03-05-00449-CV






Chevron Pipeline Company and West Texas Gulf Pipeline Company, Appellants



v.



Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas,

and Greg Abbott, Attorney General of the State of Texas, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT

NO. GN304712, HONORABLE PAUL DAVIS, JUDGE PRESIDING





O P I N I O N



 Upon consideration of appellants' motion for rehearing, we deny the motion;
however, we withdraw our opinion and judgment of August 4, 2006, and substitute the following. 
Chevron Pipeline Company and West Texas Gulf Pipeline Company (1) appeal the district court's
judgment affirming the Comptroller's (2) determination of tax liability for excavation and backfilling
services and the remedial installation of cathodic protection (3) devices. Chevron argues that its
purchase of these services was non-taxable. In two issues, Chevron challenges the legal sufficiency
of the evidence, contending that (1) excavation and backfilling services are non-taxable "unrelated
services" under Comptroller Rule 3.357, see 34 Tex. Admin. Code § 3.357 (2005), and (2) the
remedial installation of cathodic protection devices was non-taxable "new construction," and not
taxable "real property repair and remodeling." See Tex. Tax. Code Ann. § 151.0101(a)(13)
(West 2002). We reject these contentions and affirm the district court's judgment.


FACTS AND PROCEDURAL BACKGROUND


 The material facts are undisputed. The Comptroller assessed taxes against Chevron
Pipeline Company during an audit period from July 1, 1991, to September 30, 1997, and against
West Texas Pipeline Company for the audit period of January 1, 1992, to December 30, 1997. 
Chevron sought a redetermination of these tax assessments and a refund from the Comptroller. See
id. §§ 111.009, .104 (West 2001). After the Comptroller denied the requests, Chevron paid the
deficiency under protest and filed suit in district court seeking a refund. See id. §§ 112.051, .052,
.151 (West 2001).

 The district court conducted a trial de novo on Chevron's claims. See id. § 112.054
(West 2001). The record reflects that Chevron owns and operates various pipelines throughout
Texas. Chevron presented two witnesses at trial--pipeline integrity technologists Mark Hildebrand
and Mark Stephen Caskey. Hildebrand testified on the issue of excavation and backfilling services. (4) 
Hildebrand explained that Chevron runs internal inspection devices through its pipelines, and he
analyzes the collected data to make necessary repairs and other recommendations. Hildebrand
testified that one type of repair involves "recoating" the pipeline. (5) Once Chevron determined that
it was necessary to recoat a pipeline, Hildebrand explained that the pipeline would be marked and
excavated; the old coating would be removed, and a new coating would be applied; then the pipeline
would be re-covered, or backfilled. Hildebrand testified that there were different crews with
different duties throughout the process. For example, one crew would excavate; another would strip
the old coating; still another would apply the new coating; and yet another crew would backfill, or
cover up, the pipeline. 

 On cross-examination, Hildebrand testified that all of the pipelines in this case were
underground and that Chevron could not recoat its underground pipelines without excavation. 
According to Hildebrand, all of the excavation services at issue were performed in conjunction with
additional repair work. Hildebrand also stated there were no instances before the trial court in which
Chevron had contracted for excavation or backfilling services apart from other repairs.

 On the issue of cathodic protection, Chevron presented the testimony of Mark
Stephen Caskey. (6) Caskey explained that cathodic protection is a method of protecting the pipelines
by installing an anode, which serves as the object of corrosion instead of the pipeline. Caskey
explained the different methods of cathodic protection that Chevron used and testified that the
anodes are typically installed in separate beds away from the pipeline, a cable is run from the anode
bed to a rectifier, and then from the rectifier to the pipeline. Caskey testified that the pipelines at
issue all had existing cathodic protection devices and that Chevron had determined "through one
means or another" that additional installations of cathodic protection devices were needed. Caskey
explained that the existing cathodic protection devices were left in place and that new holes or
trenches were dug to install additional cathodic protection devices.

 When asked on cross-examination how and where Chevron determined to install
additional cathodic protection devices, Caskey testified that the existing ground beds of anodes
would deplete over time and their useful life would come to an end. According to Caskey, Chevron
used the rectifiers to monitor the condition and effectiveness of the existing ground beds at two-month intervals, and once the anodes reached the end of their useful life, Chevron would install a
new ground bed at that location.

 At the conclusion of trial, the court granted judgment in favor of the Comptroller. 
Chevron requested findings of fact and conclusions of law, which the trial court entered on June 16,
2005. Specifically, the trial court found:

 4. Chevron and West Texas assert that they are entitled to a refund of sales taxes
wrongly assessed by the Comptroller and paid by Chevron and West Texas
on their purchases of installations of cathodic protection devices and on their
purchases of excavation and backfilling services. The installations of
cathodic protection devices and the excavation and backfilling services were
purchased by Chevron and West Texas from third-party contractors.


 5. The parties have agreed to the amounts in issue with respect to the two
matters in dispute as follows:


 a. Cathodic protection - $184,678.48

 b. Excavation and backfilling - $89,837.23


 6. Chevron and West Texas do not contest the validity or application of
Comptroller Rule 34 Tex. Admin. Code. § 3.357.


 7. Chevron and West Texas owe the sales taxes as assessed by the Comptroller.


 With respect to the issue of cathodic protection installations, the trial court entered
additional findings of fact as follows:


 8. The cathodic protection installations in issue are the repair, restoration,
remodeling or modification of an improvement to real property that is not
used as a residence or immediately adjacent to a residence and part of a
residence.


 9. The cathodic protection installations made over, rebuilt, replaced or upgraded
existing non-residential real property. The cathodic protection installations
brought back as near as can be to its original working order non-residential
real property that was broken, damaged or defective.


 10. The cathodic protection installations brought back as near as could be to its
original condition real property which was still operating and functional, but
was faded, declined or deteriorated.


* * *



 13. The cathodic protection installations did not add new, useable square footage
to an existing structure.

 With regard to excavation and backfilling services, the trial court found:



 14. The excavation and backfilling in issue is not an unrelated service.


 15. The excavation and backfilling in issue was required to perform the repairs
and recoating of the pipelines owned by Chevron and West Texas.


 16. The repair and recoating performed in conjunction with the excavation and
backfilling is taxable.


 17. The performance of the excavation and backfilling is not distinct and
identifiable from the taxable pipeline repairs.



 Based on these findings, the trial court concluded that the cathodic protection
installations and excavation and backfilling services in issue were subject to sales tax and that
Chevron and West Texas were not entitled to a refund. This appeal followed.


STANDARD OF REVIEW


 Although the Comptroller conducted a hearing and issued a decision on Chevron's
request for redetermination, judicial review in a tax refund suit brought by the taxpayer is de novo. 
Tex. Tax Code Ann. §§ 112.054, .154 (West 2001). The Administrative Procedure Act (APA)
provides that when "the manner of review authorized by law for the decision in a contested case that
is the subject of complaint is by trial de novo, the reviewing court shall try each issue of fact and law
in the manner that applies to other civil suits in this state as though there had not been an intervening
agency action or decision." Tex. Gov't Code Ann. § 2001.173 (West 2000). 

 After a de novo trial, the trial court granted judgment in favor of the Comptroller on
all issues. The trial court supported its judgment with findings of fact and conclusions of law. In
a bench trial, the court's findings of fact have the same force and effect as a jury verdict. Catalina v.
Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); GATX Terminals Corp. v. Rylander, 78 S.W.3d 630, 633
(Tex. App.--Austin 2002, no pet.). Likewise, appellate courts review the factual and legal
sufficiency of the trial court's findings of fact and conclusions of law according to the same
standards as jury findings. Catalina, 881 S.W.2d at 297.

 On appeal, Chevron challenges the legal sufficiency of the trial court's conclusions
that Chevron is liable for the tax imposed on its purchases of excavation and backfilling services and
the remedial installation of cathodic protection devices. Our consideration of Chevron's challenge
is guided by the supreme court's decision in City of Keller v. Wilson, 168 S.W.3d 802 (Tex. 2005). 
In reviewing the legal sufficiency of the evidence, we must view the evidence in the light most
favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding
contrary evidence unless reasonable jurors could not. See id. at 807. The test for legal sufficiency
is whether the evidence would enable reasonable people to reach the judgment being reviewed. Id.
at 827-28. 


DISCUSSION


 Chevron brings two issues on appeal. First, Chevron contends that the remedial
installation of cathodic protection devices is non-taxable new construction, and not taxable repair
or remodeling. Second, Chevron contends that the excavation and backfilling services purchased
in conjunction with other repair services are non-taxable "unrelated services" within the meaning
of Comptroller Rule 3.357. See 34 Tex. Admin. Code § 3.357. The Comptroller responds that it has
consistently held that remedial installations of cathodic protection devices are not new construction,
but instead constitute taxable repair or remodeling. The Comptroller further responds that
excavation and backfilling services purchased in conjunction with other pipeline repair work cannot
be "unrelated services" within the meaning of Rule 3.357. Under the standard of review for legal
sufficiency, Chevron must demonstrate that no reasonable fact-finder could have concluded that it
was not liable for the tax on the remedial installations of cathodic protection devices or its purchases
of excavation and backfilling services.


Remedial Installations of Cathodic Protection Devices

 The tax code defines "real property repair and remodeling" as the repair, restoration,
remodeling, or modification of an improvement to real property. Tex. Tax Code Ann. § 151.0047
(West 2002). The legislature has imposed a tax on real property repair and remodeling services in
section 151.0101(a)(13) of the tax code. Tex. Tax Code Ann. § 151.0101(a)(13) (West 2002). The
Comptroller has exclusive jurisdiction to determine whether services fall into this category. Id.
§ 151.0101(b). In exercise of this jurisdiction, the Comptroller has adopted Rule 3.357. See
34 Tex. Admin. Code § 3.357 (2005). (7) Chevron does not challenge the validity or applicability of
Rule 3.357.

 Rule 3.357 includes the following definitions of new construction and remodeling,
repair, and restoration:


 (8) New construction--All new improvements to real property including initial
finish out work to the interior or exterior of the improvement. An example
is a multiple story building that has had only its first floor finished and
occupied. The initial finish out of each additional floor before initial
occupancy or use is considered new construction. New construction also
includes the addition of new, usable square footage to an existing structure. 
Examples are the addition of a new wing onto an existing building, or the
addition of a new mezzanine level within an existing building. Reallocation
of existing square footage inside a structure is remodeling and does not
constitute the addition of new, usable square footage. For example, the
removal or relocation of interior walls to expand the size of a room, or the
finish out of an office space that was previously used for storage, is
remodeling. Raising the ceiling of a room or the roof of a building is not new
construction unless new, usable square footage is created.


* * *



 (11) Remodeling or modification--To rebuild, replace, alter, modify, or upgrade
existing real property. However, the replacement of an item that is within an
operational and functional improvement to realty is not taxable remodeling
or modification when the work is scheduled and periodic maintenance as
defined in paragraph (7) of this subsection. . . . Work that is performed after
the initial finish out has been completed is remodeling even when the
improvement has not been occupied or used. For example, a prospective
tenant wants the unit of a completely finished out shopping complex
repainted before the tenant leases the unit. The repainting is remodeling.
Partial demolition of existing nonresidential realty is taxable remodeling. 
The complete demolition of an existing nonresidential improvement to real
property is neither remodeling nor modification and is not taxable.


 (12) Repair--To mend or bring back real property that was broken, damaged, or
defective as near as possible to its original working order. However, minor
repair work that is performed on operational and functional improvements to
realty is not taxable repair if the work is done in accordance with paragraph
(7) of this subsection.


* * *


 (14) Restoration--An activity that is performed to bring back real property that is
still operational and functional but that has faded, declined, or deteriorated,
as near as possible to its original condition. Minor restorative work that is
performed within the meaning of paragraph (7) of this subsection is
maintenance, not restoration.

34 Tex. Admin. Code § 3.357(a)(8), (11) - (12), (14) (emphasis added).

 In support of its argument that the remedial installation of cathodic protection devices
is new construction and not remodeling or repair, Chevron argues that the evidence conclusively
established that remedial installation of additional cathodic protection devices was new construction
because it resulted in "the addition of new usable square footage." Chevron's argument misses the
point. To qualify as new construction under Rule 3.357, the activity must result in "the addition of
new, usable square footage to an existing structure." See 34 Tex. Admin. Code § 3.357(a)(8)
(emphasis added). Although Caskey testified that the remedial cathodic protection devices were
installed in new holes or new trenches, this activity does not meet the definition of "new
construction" in Rule 3.357.

 There is no evidence that the remedial installations of cathodic protection devices
expanded the capacity of the existing pipeline. Rather the evidence demonstrates that remedial
installation of cathodic protection devices simply prevents the existing pipeline from corroding. 
Caskey testified that all of the pipelines at issue already had existing cathodic protection devices and
that Chevron would only install new anode ground beds when the rectifiers indicated that the
existing ground beds were depleted or failing. Caskey also testified that the existing cathodic
protection devices would be left in place to provide whatever protection remained. The remedial
installations of cathodic protection devices do not add "new, usable square footage to an existing
structure" within the meaning of Rule 3.357 and, therefore, do not satisfy the rule's definition of
"new construction." To borrow an analogy from major-league baseball, the remedial installation of
cathodic protection devices is like adding stadium lights to Wrigley Field. (8) It allows you to use the
existing structure for a longer period of time, but it does not increase the usable square footage of
the existing structure. Chevron's arguments are contrary to this Court's opinion in GATX Terminals
Corporation v. Rylander, in which we held that the plain language of Rule 3.357 contemplates
something more than "the addition of new equipment." See 78 S.W.3d at 641. The evidence
demonstrates that the existing cathodic protection devices remained in place. Therefore, the trial
court could have properly inferred that the remedial installations of additional cathodic protection
devices simply upgraded or replaced the protection provided by existing devices. Viewing this
evidence in the light most favorable to the verdict, and crediting all favorable evidence that a
reasonable fact-finder could believe while disregarding all contrary evidence except that which a
reasonable fact-finder could not ignore, we conclude that the evidence was legally sufficient to
support the trial court's findings of fact and its conclusion that Chevron was liable for the tax
imposed on the installations of remedial cathodic protection devices. See City of Keller, 168 S.W.3d
at 829-30.

 To the extent Chevron cites other Comptroller decisions in support of its claim that
remedial installations of cathodic protection devices qualify as non-taxable new construction,
Chevron's efforts are unavailing. Because the Comptroller has exclusive jurisdiction to interpret
whether a particular service falls within the categories of "taxable services" enumerated in
section 151.0101(a) of the tax code, we defer to the Comptroller's construction of Rule 3.357. See
Tex. Tax Code Ann. § 151.0101(b). (9) None of the decisions cited by Chevron involve remedial
installations of cathodic protection devices. In contrast, the Comptroller has previously and
consistently rejected similar claims that remedial installations of cathodic protection devices add
new, usable square footage and, therefore, constitute non-taxable, new construction. See
Hearing Decision No. 31,964 (Tex. Comptroller of Pub. Accounts 1996); Hearing Decision No.
28,327 (Tex. Comptroller of Pub. Accounts 1992). We overrule Chevron's first issue.


Excavation and Backfilling Services

 In its second issue, Chevron challenges the legal sufficiency of the evidence to
support the trial court's findings that excavation and backfilling services are not "unrelated services"
and its conclusion that such services are subject to taxation. Chevron argues that because excavation
and backfilling services are non-taxable when provided on a stand-alone basis, such services
constitute "unrelated services" within the meaning of Comptroller Rule 3.357(a)(15). We disagree.

 The legislature has imposed a tax on each sale of a "taxable item." Tex. Tax Code
Ann. § 151.051 (West 2002). The term "taxable item" includes "taxable services." Id. § 151.010
(West 2002). Although excavation and backfilling services are not included in the list of taxable
services in section 151.0101 of the tax code, see id. § 151.0101(a), the Comptroller imposed a tax
on those excavation and backfilling services purchased by Chevron in conjunction with its purchases
of pipeline recoating services. The parties agree that the pipeline recoating services purchased by
Chevron are taxable repair services. See Tex. Tax Code Ann. § 151.0101(a)(13); 34 Tex. Admin.
Code § 3.357(a)(12). The parties likewise agree that excavation and backfilling services are non-taxable when provided on a stand-alone basis. See Tex. Tax Code Ann. § 151.0101(a). The dispute
at issue thus concerns how to treat, for taxation purposes, excavation and backfilling services
purchased in conjunction with pipeline repair services.

 Rule 3.357 governs the taxation of the repair, remodeling, or restoration of
nonresidential real property. 34 Tex. Admin. Code § 3.357. The rule requires all persons who
repair, restore, or remodel nonresidential real property to collect taxes on the "total sales price . . .
less separately stated charges for unrelated services." Id. § 3.357(b)(2). Rule 3.357(a)(15) provides:


 A service is unrelated if:



 (A) it is not the repair, remodeling, or restoration of nonresidential real
property, nor a service or labor that is taxable under any other
provision of the Tax Code, Chapter 151;


 (B) it is of a type that is commonly provided on a stand-alone basis; and


 (C) the performance of the service is distinct and identifiable. Examples
of unrelated services that may be excluded from the tax base are the
creation of engineering plans or architectural designs, new
construction, increased capacity, and maintenance on real property.



Id. § 3.357(a)(15). The rule thus establishes a three-prong test for determining whether a service is
an "unrelated service." See id. The parties agree that the excavation and backfilling services at issue 
meet the first prong of this test--i.e., they are non-taxable services. Their dispute centers on prongs
two and three and whether excavation and backfilling services are a type of service that is commonly
provided on a stand-alone basis and whether the performance of such services is distinct and
identifiable.

 At trial, Chevron witness Mark Hildebrand testified that although Chevron at times
has excavated and backfilled its pipelines without repairing them, that is not what happened in this
case. According to Hildebrand's testimony, Chevron had already determined that the pipelines were
in need of repair, and Chevron excavated the pipelines for the sole purpose of performing the
necessary repairs. Hildebrand testified that the underground pipelines could not be recoated without
excavating and backfilling and that there were no instances before the trial court in which Chevron
contracted solely for excavation and backfilling services. On cross-examination, Hildebrand agreed
that the basic purpose of all the contracts at issue was for repair and recoating services for which
excavation was required, and not for excavation and backfilling services on a stand-alone basis.

 On this record, we conclude that there was legally sufficient evidence to support the
trial court's finding that "[t]he excavation and backfilling in issue is not an unrelated service." The
evidence presented at trial demonstrates that Chevron did not contract for excavation and backfilling
services on a stand-alone basis as contemplated under Rule 3.357(a)(15). Assuming arguendo that
excavation and backfilling services might otherwise be "commonly provided on a stand-alone basis,"
that is not what happened here. Thus, Chevron fails to satisfy the second prong of Rule 3.357(a)(15). 
Hildebrand's uncontroverted testimony establishes that Chevron's performance of excavation and
backfilling services was not distinct and identifiable. This was not a situation where Chevron
excavated the pipelines in order to determine whether or not repairs were needed. In this case,
Chevron had already determined that repairs were in fact necessary through other means, and
Chevron hired the same third-party contractors to perform both excavation and backfilling services
as well as the repair and recoating services. As explained by Hildebrand, the process worked like
one continuous assembly line. One crew would excavate the pipeline; another would repair or recoat
the pipeline; and another crew would follow along and backfill the pipeline once the repairs were
completed. In addition, Hildebrand testified on cross-examination that Chevron could not recoat its
underground pipelines without excavation and backfilling and that all of the invoices reflected costs
for both excavation and backfilling services as well as pipeline repair or recoating services. (10) Thus,
Chevron fails to satisfy the third prong of Rule 3.357(a)(15).

 Viewing the record as a whole, giving credit to all evidence favorable to the verdict,
we find that no reasonable fact-finder could have ignored Hildebrand's uncontroverted testimony
that Chevron did not contract for excavation and backfilling services on a stand-alone basis, even
if such services could be provided on a stand-alone basis. See City of Keller, 168 S.W.3d at 807,
827-28. Hildebrand's testimony further reveals that the excavation and backfilling services at issue
were a necessary and integral part of the recoating process to repair Chevron's underground
pipelines, and no reasonable fact-finder could have determined that the excavation and backfilling
services at issue were distinct and identifiable. See id. Accordingly, we conclude there was legally
sufficient evidence to support the trial court's findings that excavation and backfilling services were
required to perform the repair and recoating services and that such services were not distinct and
identifiable and, therefore, did not constitute an "unrelated service" within the meaning of
Rule 3.357(a)(15). We also conclude that the evidence was legally sufficient to support the trial
court's conclusion that Chevron's purchase of excavation and backfilling services was subject to tax. 
We overrule Chevron's second issue.


CONCLUSION


 Having examined the evidence presented at trial, we conclude that there was legally
sufficient evidence to support the trial court's findings of fact and conclusions of law. Accordingly,
we affirm the trial court's judgment.




 __________________________________________

 Jan P. Patterson, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed: October 26, 2006
1. Because the interests of Chevron Pipeline Company and West Texas Gulf Pipeline
converge, we refer to appellants collectively as "Chevron" unless otherwise noted.
2. Because the interests of the Comptroller of Public Accounts and the Attorney General
converge, we refer to the appellees collectively as the "Comptroller."
3. Cathodic protection is a process used to halt or reduce the corrosion of steel pipelines.
4. In addition to Hildebrand's testimony, Chevron introduced into evidence copies of all of
the invoices for the excavation and backfilling services at issue.
5. Hildebrand testified, "The term 'recoating' is a blanket term we use in the pipeline
industry." It can mean repainting for above-ground pipelines, or it can mean rewrapping, or putting
on an epoxy coating or other sleeving for underground pipelines.
6. In addition to Caskey's testimony, Chevron also introduced into evidence pictures of the
various types of cathodic protection installations at issue.
7. For convenience, we cite to the current version of Rule 3.357. Although Rule 3.357 has
been amended during the pendency of this litigation, the parties agree that the amendments do not
alter the substance of the rule or its application to the facts of this case.
8. Although Wrigley Field was originally built in 1914, the Chicago Cubs did not add lights
until 1988. The first nighttime game was played on August 8 against the Philadelphia Phillies, but
it was rained out after three-and-one-half innings. See www.chicago.cubs.nlb.com/NASApp/mlb/
chc/ballpark/index.jsp.
9. Section 151.0101(b) states:


 The comptroller shall have exclusive jurisdiction to interpret Subsection (a) of this
section.


Tex. Tax Code Ann. § 151.0101(b).
10. We reject Chevron's contention that excavation and backfilling services should be treated
as non-taxable in those instances where the costs for such services are itemized, or broken out, from
the total invoiced amount. The Comptroller has previously determined that "separate billing for
different components of a single transaction will not cause the components to be taxed separately." 
See Letter Ruling No. 20010267L (Tex. Comptroller of Pub. Accounts 2001). The Comptroller's
determination is consistent with this Court's holding in Rylander v. San Antonio SMSA Limited
Partnership, 11 S.W.3d 484 (Tex. App.--Austin 2000, no pet.).